1
2
3
4
5
6
7
8
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA
9
10
11
12
13
14
15
16
17
18

ANWAR AL-AQRABAWI,

                    Plaintiff,

        v.

PIERCE COUNTY; and DAVE STEWART,
TIM HOLMES, and CHRIS LARSON,
individually and in their official capacities
acting under color of federal, state and county
law,

                    Defendants.

Case No.  C07-5341RJB

ORDER ON DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT

19
20
21
        This matter comes before the court on Defendants' Motion for Summary Judgment. Dkt. 35.

The court has considered the pleadings filed in support of and in opposition to the motions and the file

herein.

22
                            PROCEDURAL HISTORY

23
24
25
26
27
28
        On July 16, 2007, plaintiff, an employee of Pierce County, filed a civil action against

defendants Pierce County, and county employees Dave Stewart, Tim Holmes, and Chris Larsen.  Dkt.

1.  The complaint alleges the following claims: (1) discrimination on the basis of race, creed, color,

national origin, and age; hostile work environment; disparate treatment; and retaliation in violation of

the Washington Law Against Discrimination, chapter 49.60 RCW; (2) discrimination on the basis of

race, creed, color, national origin, and age; hostile work environment; disparate treatment; and

retaliation, in violation of 42 U.S.C. § 1981; (3) violation of plaintiff's rights to equal protection and due process under 42 U.S.C. § 1983, based upon discrimination on the basis of race, creed, color, national origin, and age; hostile work environment; disparate treatment; and retaliation; (4) violation of 42 U.S.C. § 1985, based upon conspiracy to discriminate against plaintiff on the basis of race, creed, color, national origin, and age; hostile work environment; disparate treatment; and retaliation; (5) discrimination on the basis of race, creed, color, national origin, and age; hostile work environment; disparate treatment; and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*; and (6) intentional, reckless, and negligent infliction of emotional distress. Dkt. 1. The complaint requests declaratory and injunctive relief and damages. Id. at 32-33.

MOTION FOR SUMMARY JUDGMENT

On July 15, 2008, defendants filed a motion for summary judgment, contending that (1) the hostile work environment claim should be dismissed because the conduct at issue was not severe or pervasive; the conduct was not because of plaintiff's membership in a protected class; plaintiff failed to report conduct to his employer; and some of the instances of which he complains are time-barred; (2) the disparate treatment claim for failure to promote should be dismissed because plaintiff failed to apply for two of the three positions at issue; plaintiff was not promoted to the third position because of work performance issues; plaintiff cannot show discriminatory motive on the part of Mr. Stewart, Ms. Larsen, or Mr. Stewart; defendants have shown legitimate nondiscriminatory reasons for promoting three younger individuals to the three positions at issue; and defendants did not retaliate against plaintiff for filing an EEO complaint; (3) plaintiff cannot show the intentional discrimination required for claims under 42 U.S.C. § 1981 and 42 U.S.C. § 1983; (4) plaintiff cannot show a conspiracy under 42 U.S.C. § 1985; (5) plaintiff has not shown evidence of the elements of the torts of outrage and negligent infliction of emotional distress; and (6) portions of plaintiff's claims are time barred. Dkt. 35.

In his response to the motion for summary judgment, plaintiff maintains that (1) plaintiff's supervisor, Tim Holmes, knew of harassment by Ms. Overstreet, Mr. DeVoe, and Mr. Horn; (2) plaintiff's supervisor, Chris Larsen, harassed plaintiff about his foreign accent; (3) plaintiff filed an EEO complaint on August 24, 2006, and management found out about it; (4) rather than helping him

obtain Mental Health Professional (MHP) status, Mr. Holmes told him to go to graduate school; (5)

Pierce County failed to promote plaintiff despite his qualifications; (6) Pierce County engaged in

systematic retaliation by issuing a Memo of Expectations, moving him to a different unit, giving him

low ratings on his annual review, placing him on a Professional Development Program, and attempting

to suspend him. Dkt. 49.

On August 8, 2008, defendants filed a reply, contending that (1) plaintiff as not promoted

because of performance issues involving his working relationships with his co-workers; (2) plaintiff

has not established a prima facie case with regard to positions that were unfilled; (3) plaintiff did not

apply for positions that were obtained by Jamie Long, Adam Horn, or Robert Hamilton; (4) plaintiff's

opinion that he was more qualified than his peers for a supervisory position is insufficient to create a

material issue of fact; (5) Keith Lewis was promoted to a Direct Services Supervisor position rather

than plaintiff because Mr. Lewis showed that he was more qualified for the position than plaintiff; (6)

defendants have stated a legitimate reason why plaintiff was not promoted once his performance issues

arose; (7) plaintiff has failed to show pretext with regard to his disparate treatment claim; (8) Mr.

Stewart attempted to assist plaintiff in obtaining the qualifications for promotion; (9) plaintiff's

workplace harassment claim relies primarily on isolated, stray remarks, or remarks that are not related

to plaintiff's membership in a protected class. Dkt. 52.

<u>RELEVANT FACTS</u>

The facts in this case are very confusing and it has been difficult for the court to develop a

clear picture of the events and the sequence of events. The court will attempt to assemble the facts to

show the history of plaintiff's employment, the promotional opportunities plaintiff claims he was

denied, and comments that he alleges were made to or about him.

Plaintiff is a 56 year old Jordanian-born Arab American of the Muslim faith. He was educated

as a physician, and practiced as a physician outside of the United States, but was not licensed to

practice in Washington. In February of 1997, plaintiff was certified as a Nursing Assistant in

Washington; and in August of 2001, he was became a registered counselor in Washington.

*Plaintiff's Employment through Private Temporary Agency at Puget Sound Hospital.* In

2001, plaintiff began working, through a private temporary agency, at Puget Sound Hospital, Pierce

County's mental health facility, as a nursing assistant, and later as a Behavioral Health Specialist (BHS). The Behavioral Health Specialist position is an entry level clinician position that does not require a Mental Health Professional (MHP) designation. Dkt. 45, at 4. During the time he worked at Puget Sound Hospital, plaintiff was supervised by Chris Larsen, Tim Holmes, and Dave Stewart; and later, by Adam Horn, Mr. Holmes, and Mr. Stewart. It is unclear from the record who supervised plaintiff when.

Plaintiff stated in his deposition that, during the time he worked for the private temporary agency, two incidents occurred shortly after September 11, 2001. The first was an alleged comment by Bunny Overstreet, a Licensed Practical Nurse, as she walked by, stating, "I don't know if you're one of them." Dkt. 36, at 9. He did not report this comment to anyone, and no one else was present when the comment was made. Dkt. 50, at 11. Plaintiff stated that, at about the same time, an RN named Chris (not a defendant in this case) made the following comment: "We have to send in our Phantoms and bomb their Mecca." Dkt. 36, at 18. Plaintiff testified that he responded that, "because of somebody, we don't accuse everybody"; that Chris asked plaintiff if he was a Muslim, that plaintiff told him he was; and that Chris stated, "Oh, I'm sorry, I thought you are an Indian." Dkt. 36, at 20-21. Plaintiff did not report this conversation to anyone at the facility at that time. Dkt. 36, at 21. It is unclear to what extent Pierce County could be liable for plaintiff's claims while he was employed by the private temporary agency.

Plaintiff stated that Ms. Overstreet "made a lot of other comments again, of my accent." Dkt. 50, at 12. In response to the question of whether he had ever reported Ms. Overstreet's comments, plaintiff stated "I made several times, to the point, one time, I even cried." Dkt. 50, at 12. Plaintiff stated that he reported this conduct to Mr. Holmes, that "[i]t was ongoing, so it's–I told him many times." Dkt. 50, at 12.

*Plaintiff's Employment by Pierce County from December 6, 2000 to December 11, 2005.* On December 6, 2002, plaintiff applied for a Behavioral Health Specialist position with the county, and was hired in December of 2003, after being interviewed by Mr. Stewart, Judy Snow, and Ms. Larsen. Dkt. 36, at 8. His primary assignment as a Behavioral Health Specialist is, and was, except for the time period when the was transferred to the Evaluation & Treatment (E & T) center (November 17,

2006 to March 20, 2007), in the Crisis Triage Center (CTC), which is the County's short term secure facility that accepts people experiencing any type of behavioral health crisis, and works with them to resolve the crisis and connect them to appropriate community resources. Dkt. 45, at 4. The Evaluation and Treatment center is a 30-bed facility that is certified to provide voluntary and involuntary psychiatric inpatient treatment for adolescents and adults. Dkt. 45, at 4. Mr. Holmes is the clinical coordinator for the Crisis Triage Center and the E & T center. Dkt. 37, at 1.

Plaintiff stated that, in late December of 2003, while he was on a break with Ms. Overstreet, she started talking about religion and politics and then commented, "Your Mohammad is a shit." Dkt. 36, at 12. Plaintiff stated that he told Ms. Overstreet, "Please, we don't have to discuss these things." Dkt. 36, at 12. A few days later, Mr. Stewart told plaintiff that he had noticed that plaintiff and Ms. Overstreet were not talking to one another. Mr. Stewart stated that he got them together, and plaintiff told Mr. Stewart what had happened. Dkt. 36, at 13-14. Ms. Overstreet apologized. Dkt. 36 at 14-16. After that meeting, plaintiff does not recall other comments Ms. Overstreet made about his religion, but she made "a lot of other comments" about his accent. Dkt. 36, at 16. Plaintiff did not report any of the comments Ms. Overstreet made about his accent. Dkt. 36, at 16.

Plaintiff testified that, in December of 2003, Lauren Samball called him to ask him to work a fifth overtime shift in a pay period when only four were permitted. Dkt. 36, at 32-33. Plaintiff stated that Ms. Samball told him that Ms. Larsen had approved it, but when plaintiff showed up to work, Ms. Larsen sent him home after two hours. Dkt. 36, at 33-36.

On March 2, 2004, Pierce County Human Resources Analyst Kathie Lybecker contacted the state and asked whether plaintiff's education and experience qualified him for Mental Health Professional status; she was told that they did not. Ms. Lybecker informed plaintiff of this. On April 4, 2004, plaintiff contacted the State and plaintiff was told to send specific information regarding his education and job duties.

On June 18, 2004, Ms. Larsen gave plaintiff a positive probationary performance review, noting that he met standards and should seek Mental Health Professional status.

On November 18, 2004, the Crisis Triage Staff, including plaintiff, received an award from the county at its Standing Ovation Awards Banquet. Plaintiff stated that he did not receive an invitation;

that when he showed up for the banquet, he was told he was not on the list; and that he then left the banquet. Defendants maintain that plaintiff received an invitation but did not send in his reservation for the banquet; that employees tried to include plaintiff at the banquet but that plaintiff declined and left the banquet.

On February 15, 2005, Mr. Holmes sent plaintiff an e-mail recognizing plaintiff's good attitude, setting a good example for others. On March 2, 2005, Mr. Holmes gave plaintiff a performance review that included several positive comments, including a note that plaintiff should seek Mental Health Professional status.

Plaintiff testified that, after he obtained his citizenship in March of 2005, Ms. Larsen told him, during a shift report meeting, "Now it is time to change your accent." Dkt. 50, at 13. Plaintiff stated that she said this many times. Dkt. 50, at 17.

Plaintiff testified that, in 2005, RN Bill DeVoe stated, in an elevator full of people: "We went to bring you democracy and you are killing us." Dkt. 36, at 23. Mr. DeVoe worked as a temporary agency worker. Plaintiff stated that he sent an e-mail on June 23, 2005, to Mr. Holmes, referring to the incident in the elevator, and stating "This is not a complaint." Dkt. 36, at 27. Plaintiff stated that, on another occasion, Mr. DeVoe mimicked Sadam Hussein having been given American food." Dkt. 36, at 24. Plaintiff stated that he told Mr. DeVoe to stop it. Dkt. 36, at 24. Plaintiff stated that he told Mr. Holmes about the incident, and that he told him that it wasn't a complaint but that he asked Mr. Holmes "to just pay his attention." Dkt. 36, at 25. Mr. Holmes stated in his declaration that either he or Catherine Clarke "spoke directly to Bill DeVoe regarding the inappropriateness of his comments." Dkt. 37, at 2. Plaintiff has produced no evidence that Mr. DeVoe made any further inappropriate comments.

Plaintiff testified that, in 2005, he walked into an office and heard Jim Jorgensen, a Behavioral Health Specialist, saying to Mr. Holmes, "The shit, Anwar, has eight hours' seniority over me." Dkt. 36, at 30. Three or four days later, Mr. Jorgensen initiated a conversation with plaintiff and apologized for the comment. Dkt. 36, at 30-31.

Plaintiff testified that, in the Fall of 2005, he was researching avian flu on the computer, in the presence of Adam Horn. Dkt. 50, at 14. Plaintiff stated that he tried to explain something to Mr.

Horn, and Mr. Horn stated "Do you think I would take advice from an Arab?" Dkt. 50, at 15. Plaintiff stated that Mr. Holmes was present and heard the comment; Mr. Holmes' face turned red; Mr. Holmes came up to plaintiff and asked plaintiff if he was okay; and plaintiff said, "Yeah." Dkt. 50, at 16. Plaintiff stated that Mr. Holmes did not say anything to Mr. Horn at that time, and that he did not know if anything happened after that. Dkt. 50, at 16. Other than plaintiff's statement that Mr. Holmes did not say anything to Mr. Horn, the record does not indicate what, if anything, Mr. Holmes did or said to anyone else.

Plaintiff testified that, at a staff meeting in late December of 2005, when plaintiff tried to talk, Mr. Holmes, with a red face, "pointed his finger at me, saying very loudly, 'you need to stop it right now.'" Dkt. 36, at 39.

*Promotional Opportunities from December 11, 2005 to August 28, 2006.* On December 11, 2005, three Direct Services Supervisor positions were opened under recruitment #3169. Dkt. 41, at 2. On December 23, 2005, recruitment #3169 was closed.

On January 6, 2006, Pierce County Human Resources Analyst Kathie Lybecker spoke with the State to inquire whether plaintiff met the Mental Health Professional criteria because plaintiff was applying for a position (recruitment # 3169) that required an MHP designation; she was informed that plaintiff did not meet the requirements. Ms. Lybecker spoke with Mr. Stewart about this; Mr. Stewart then pursued the matter with the State, requesting that the State re-review the request. On February 7, 2006, the State informed Mr. Stewart that plaintiff's credentials did not meet the requirements. On February 8, 2006, plaintiff was advised that he did not meet the criteria for the position (recruitment # 3169) because MHP designation was as requirement.

On February 10, 2006, Mr. Stewart requested that the State discuss plaintiff's educational transcripts and the State's decision with him. On February 13, 2006, Mr. Stewart was informed that plaintiff met the Mental Health Professional requirements but that the designation would have restrictions of no DMHP work as well as no intake assessments for outpatient services. DMHP is apparently an acronym for "Designated Mental Health Professional"–an individual who evaluates people with mental disorders for possible involuntary detention psychiatric facilities according to the mental health law in Washington, RCW 71.05 for adults and RCW 71.34 for youths 13 through 17.

On February 14, 2006, the State notified plaintiff that he had been granted the MHP designation with the restrictions noted above.

On February 14, 2006, plaintiff e-mailed Ms. Lybecker, asking whether his application for the Direct Services Supervisor position could be considered. Ms. Lybecker responded, indicating that they were in the process of making an offer for two of the positions, and that plaintiff did not qualify for the third position because he did not have a Chemical Dependency Professional designation. On February 27, 2006, three of the Direct Services Supervisor positions (recruitment #3169) were filled by Gigi Arrington, Jim Jorgenson and Kristin Brown. While three of the positions were filled, the interview sheet notes that one position was left unfilled. *See* Dkt. 50, at 53 ("Dept was not able to make a selection – looking at alternative register"). Plaintiff was not considered for, interviewed for, or promoted to the unfilled position under recruitment #3169.

On April 24, 2006, Robert Hamilton was promoted to a Direct Services Supervisor position. This position was filled by recruitment #3259; plaintiff did not apply for this recruitment. Plaintiff stated in his deposition that the position required "a master's degree, you have to be qualified as an MHP and have the experience of supervisor. My understanding, he does not meet those standards." Dkt. 50, at 20. Plaintiff does not appear to have personal knowledge regarding Mr. Hamilton's qualifications. See Dkt. 50, at 20. Ms. Lybecker stated in a declaration that both Direct Services Supervisor and Mental Health Therapist positions require a designation as a Mental Health Professional, and that Direct Services Supervisor recruitment #3259 required certification as a Chemical Dependency Professional. Dkt. 55, at 1-2. Ms. Lybecker stated that Mr. Hamilton was certified as a Chemical Dependency Professional, which was a requirement for this recruitment, but that plaintiff's applications did not shown that he was certified as a Chemical Dependency Professional. *Id.*

On April 8, 2006, plaintiff applied for a Mental Health Therapist position, and he interviewed for that position on May 16, 2006 (recruitment #3287). On June 13, 2006, plaintiff was informed that Pierce County closed the position, claiming that "no applicant matched the needs of the department." Dkt. 50, at 55. As a result, plaintiff was not promoted to the position.

On June 15, 2006, plaintiff applied for a Direct Services Supervisor position, recruitment

#3347.  On July 27, 2006, plaintiff was interviewed for recruitment #3347, qualifying for a second interview.

On August 10, 2006, plaintiff had a second interview for recruitment #3347 with Mr. Stewart and Fran Lewis, Director of Human Services. Stewart stated in his declaration as follows:

> We both agreed that during the interview he had demonstrated outstanding skills as a BHS2 (Behavioral Health Specialist) but did not answer the questions we had for him as a DSS applicant in a way that demonstrated he understood what was expected or had the abilities to fulfill the supervisory expectations of a DSS.  The interview questions were designed to encourage candidates to talk about their skills and styles in directing teams and individual's problem solving an d coaching, as well as external customer relations.  While Mr. Al-Aqrabawi gave answers detailing how he would personally assess and handle challenging clients, he did not demonstrate the understanding or the need to train and coach others on this type of problem solving.  These skills are essential and demonstrated by all successful candidates for DSS positions.  For example, when asked a question about building and supporting teamwork, he provided an answer indicating how he would assess an individual consumer.  These answers were consistent with the skill set required of a BHS 2, the position he held at the time, but did not indicate that he was ready to assume a leadership role as supervisor.

Dkt. 45, at 2-3.

About a week later, Mr. Stewart stated that he met with plaintiff and offered to assist him in obtaining skills that would assist him in assuming a supervisory role.  Dkt. 45, at 3.  Mr. Stewart stated that plaintiff told him that he believed he had been treated unfairly because of his language, ethnicity and his religion.  Dkt. 45, at 53.

On August 18, 2006, Pierce County reopened recruitment for Direct Services Supervisor recruitment #3347 and #3417.  On August 28, 2006, Keith Lewis, an African-American employee, was promoted to Direct Services Supervisor, from recruitment #3347.  Mr. Stewart stated that he and Ms. Lewis interviewed Mr. Lewis; that the interviewers were impressed by the amount of professionalism and growth in the area of supervisory skills Mr. Lewis demonstrated; that he was able to properly identify the role and responsibilities expected of someone performing at a supervisory level; that he demonstrated growth from his first DSS interviews with Mr. Stewart and was able to articulate a clear understanding of the E & T unit and the importance of the supervisor's role in fostering support for these goals within his team and developing positive relationships with allied providers.  Dkt. 56, at 1-2.  Plaintiff was not selected for the position.

*Conflict with Co-Workers and Plaintiff's Applications for Promotion.*  On September 7, 2006, Mr. Holmes notified the Crisis Triage Center nurses and triage staff that Kathleen Pritchard was to be

acting as point of contact for the CTC evening shift (the shift on which plaintiff worked), which meant that Ms. Pritchard would be delegating tasks and assigning clients to staff during report. Dkt. 37, at 42.

It appears from the record that, after Mr. Pritchard's Point of Contact designation, conflicts developed between plaintiff and staff members.

On September 27, 2006, Ms. Pritchard forwarded to Mr. Holmes an e-mail she received from plaintiff, as follows:

> I noticed lately all kind of instructions and intervening in issues related to clients that I have been dealing with many of them for so many years. Please, if you have any concern or any further instructions, although, the POC [point of contact] is not a leadership position, please do it in writing, as by e-mail if you would. Thanks[.]

Dkt. 37, at 43.

On September 11, 2006, Jamie Long was promoted to the Mental Health Therapist position, recruitment #3357. Plaintiff did not apply for this position.

On September 15, 2006, plaintiff applied for Direct Services Supervisor Job #3347.

From September 27, 2006, until November 5, 2006, Ms. Pritchard and other staff members on the evening shift complained to Mr. Holmes about their difficulty working with plaintiff, including his not following directions and leaving the unit. Dkt. 37, at 44-52.

On October 9, 2006, Adam Horn, who had previously interviewed for the Mental Health Therapist job on May 16, 2006, but was not selected, was promoted to the Mental Health Therapist position, under recruitment #3357. Plaintiff did not apply for recruitment #3357.

On October 24, 2006, plaintiff filed an EEO complaint with Pierce County, contending that he was being passed over for advancement opportunities based on his national origin, race, religion and accent. Dkt. 39.

Debbie Young, a labor analyst for Pierce County Human Resources, stated in a declaration that, on November 6, 2006, she was contacted by Mr. Stewart, and later Mr. Holmes, to discuss the possibility of a memo of expectations for plaintiff, and a memo of expectations was drafted. Dkt. 44, at 2.

On November 7, 2006, plaintiff was interviewed for Direct Services Supervisor Job #3417. On November 6, 2006, prior to the interview, Mr. Stewart e-mailed Fran Lewis, stating as follows:

[W]e are working with HR on an appropriate response to this situation. He has a current complaint filed with EEO and we have been told by HR that we have to interview him again for DSS (he filed another application), so wanted to make sure that our response to his performance issues did not cause any other side effects.

Dkt. 50, at 37.

Ms. Lewis responded as follows:

Do we have any of the staff complaints documents (i.e. written)? Why do we have to interview him again? He applied again?

Dkt. 50, at 37.

Mr. Stewart responded as follows:

We may have some e-mails from other staff, but I think is mostly (if not entirely) verbal. Yes, he did apply again, we checked, and Kathie told us she was told we had to interview him again (apparently because we had interviewed Adam Horne [sic] twice for the same position).

Dkt. 50, at 37.

On November 10, 2006, staff member Catherine Clark sent an e-mail to Mr. Holmes, informing him of a conversation she had had with plaintiff. "I told him that his behaviors could be seen as insubordination and that it was important to follow the lead. We continued to discuss the lead person and their qualifications again and why he says that the person does not have the qualifications needed to fulfill the duties." Dkt. 37, at 60.

On November 17, 2006, as a result of continuing conflict between plaintiff and staff members, supervisory staff decided to temporarily transfer plaintiff to the E & T Center. Dkt. 37, at 2; Dkt. 37, at 61-67; Dkt. 54, at 1.

On November 24, 2006, December 20, 2006, and December 29, 2006, Mr. Horn sent e-mails to Mr. Holmes, complaining that plaintiff refused to follow orders from his supervisors. Dkt. 37, at 68-71.

On December 20, 2006, Mr. Horn was appointed as the temporary Direct Services Supervisor. Plaintiff contends that, as a temporary appointment, the county did not need to open the position to others or interview. Mr. Holmes stated in his deposition that plaintiff was not named as an acting Direct Services Supervisor at this time because plaintiff was exhibited problems at work and missing work often. Dkt. 37, at 3.

On January 8, 2007, plaintiff received a letter of reprimand, drafted by Debbie Young and Mr.

Holmes. Dkt. 44, at 1.

On January 11, 2007, plaintiff applied for Direct Services Supervisor recruitment #3495. Mr. Stewart stated in his declaration that he decided not to interview plaintiff for this position, based on his interviews for recruitments #3347 and #3417, and his work performance as outlined in the memo of expectations and letter of reprimand. Dkt. 45, at 3-4. Mr. Holmes stated that plaintiff was not named as an acting Direct Services Supervisor at this time because he was exhibiting problems at work as well as missing work often. Dkt. 37, at 3.

On January 28, 2007, plaintiff received a letter, informing him that department decided to discontinue recruiting for the Direct Services Supervisor position [recruitment #3495] because "[t]he Department found that none of the candidates interviewed matched their needs at this time." Dkt. 50, at 58.

On March 20, 2007, plaintiff was transferred back to the Crisis Triage Center. Dkt. 37, at 2.

On May 14, 2007, plaintiff apparently had an evaluation and a Performance Development plan was put in place. Dkt. 54, at 13.

On May 24, 2007, Phoutham K. Bounkeau was hired as a Direct Services Supervisor under recruitment #3495.

On July 18, 2007, staff member Holly Appleton-Edwards sent an e-mail to Mr. Holmes, expressing serious concerns with teamwork on the evening shift, specifically concerning plaintiff. "I feel that he is creating a hostile work environment. He expresses great resentment in any interruption, suggestion, or any insinuation that someone has more information, or at some points, even talks with his cl's [clients]." Dkt. 37, at 58.

Ninety days after the Performance Development Plan was put in place [approximately August 14, 2007], Mr. Holmes sent the following e-mail to Ms. Young regarding the continuance of the Performance Development Plan:

> The following problems have persisted with Anwar since his last evaluation and PDP was established 5/14/07:
>
> - When encouraged by staff to consult with her supervisor regarding clinical decisions he has refused to do so (See Adam Horn e-mail 7/24/07).
> - Staff have reported that Anwar as been "nasty", "uncooperative", "resistant", "ands totally detached from the rest of the team. (Holly's e-mail 7/18/07)
> - Anwar has continued to call in sick and/or cancel double shifts he has been

scheduled to work. His sick leave balance is at zero and he has used vacation time to cover the missed hours (See attached excel document).

- Staff have reported that he was "confrontational with supervisor" and when he was told by staff that he was making them feel uncomfortable he continued with his confronting (See Kristi Coyne e-mail 7/3/07).
- Agency staff member reports that Anwar told her there is a policy that there can not be only one BHS on the unit. He reports that he never made this statement.

We are at the end of the 90 day PDP and I would like to discuss next steps. Thanks.

Dkt. 54, at 2 and 19.

On September 24, 2007, the Performance Development Plan was continued, with the following development goals: (1) [f]ollow verbal directions given to you by lead and/or supervisory staff; (2) [b]e more dependable regarding showing up to work and remaining at work; and (3) [t]reat others with respect and in a courteous and professional manner. Dkt. 38, at 4. A second Performance Development Plan, on January 8, 2008 addressed the results of the prior plan. Dkt. 38, at 6.

On October 27, 2007, Mr. Holmes issued a Notice of Intent to Suspend to plaintiff. The notice stated that plaintiff would be suspended for two days without pay for failure to meet reasonable work performance standards. Dkt. 37, at 31-34. Plaintiff filed a grievance. Mr. Stewart met with plaintiff and his Union representative. Mr. Stewart decided that the two day suspension without pay would not be imposed. Dkt. 45, at 17. "You have convinced me that your desire is to be a productive and respected member of your team, and that you are willing to accept supervision from Mr. Horn and continue to work with him to a satisfactory conclusion of the issues currently outstanding in your PDP." Dkt. 45, at 17.

On November 19, 2007, Mr. Horn was promoted to a Direct Services Supervisor under recruitment #3495. Plaintiff did not apply for this position.

*Dave Stewart.* Plaintiff testified that Dave Stewart, who was the mental health manager, never engaged in harassment of plaintiff. Dkt. 36, at 44.

*Pierce County Anti Harassment Policy.* Under Pierce County's Anti-Harassment policy, if an employee complains to the EEO office of misconduct, it is the county's decision, not the employee's, whether to conduct an investigation. Dkt. 50, at 5. If a manager receives such information, the manager should contact human resources. Dkt. 50, at 5. It is preferred that the manager not handle the matter within his or her own department. Dkt. 50, at 5.

SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed.R.Civ.P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

DISCUSSION

*1. Disparate Treatment/Failure to Promote under Title VII, 42 U.S.C. § 1981, and the WLAD*

Plaintiff claims that he was discriminated against on the basis of his race, color, religion, sex, and national origin when he was denied promotions.

It is an unlawful employment practice for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin".  42 U.S.C. §§ 2000e-2(a)(1).

In order to prevail on a Title VII claim of discrimination, a plaintiff must first establish a prima facie case of discrimination consisting of the following elements: (1) plaintiff belongs to a protected class; (2) he was performing his job according to the employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) other employees with qualifications similar to his own were treated more favorably. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Vasquez v. County of Los Angeles*, 307 F.3d 884, n. 5 (9th Cir. 2002). If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its adverse employment decisions. *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802.  Once the defendant satisfies this burden, the plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for a discriminatory motive. *Id.* at 804.

To establish a *prima facie* case of discrimination based on failure to promote, plaintiff must show that (1) he belongs to a protected class of persons; (2) he was qualified for the position to which he wished to be promoted; (3) he was denied a promotion to that position; and (4) the job went to someone outside the protected class.  *Coughlan v. Amer. Seafoods Co.* 413 F.3d 1090, 1094 (9th Cir. 2005).

In Washington, the state courts apply the same burden-shifting scheme to cases under the WLAD, RCW 49.60, as the federal courts do to Title VII cases.  *Hill v. BCTE Income Fund-I*, 144 Wn.2d 172, 185-86 (2001)(adopting Title VII analysis from *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

42 U.S.C. § 1981(a) confers upon all persons the right "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefits of all laws and proceedings[.]" Section 1981(a) further provides that all persons shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."  In a § 1981 action, plaintiffs must show intentional discrimination on account of race. *Evans v. McKay*, 869 F.2d 1341, 1344 (9th Cir.1989).

In order to establish a prima facie case under § 1981, plaintiffs must prove: (1) that they are members of a racial minority; (2) that the defendants had an intent to discriminate on the basis of race; and (3) that the discrimination concerned one or more activities enumerated in the statute. *Morris v. Office Max, Inc.*, 89 F.3d 411, 413-14 (7th Cir. 1996); *Green v. State Bar of Texas*, 27 F.3d 1083, 1086 (5th Cir. 1994). The element of intentional discrimination in a § 1981 claim is identical to the element of intentional discrimination in a § 1983 claim. *Hispanic Taco Vendors of Washington v. City of Pasco*, 790 F.Supp. 1023, 1031 (E.D. Wash. 1991), *affirmed, Hispanic Taco Vendors of Washington v. City of Pasco*, 994 F.2d 676, 679 n. 3. (9th Cir. 1993).

Plaintiff has established that he is a Jordanian-born Arab-American of the Muslim faith. He has sufficiently alleged that he belongs to a protected class of persons.

Plaintiff alleges that, in several instances, he was not promoted. It appears that plaintiff contends defendants improperly denied him promotions based upon: recruitment #3259, #3357, #3169, #3287, #3347, #3417, and the December 20, 2006 appointment of Adam Horn as the temporary Direct Services Supervisor and the permanent appointment of Mr. Horn to the Direct Services Supervisor position under recruitment #3495.

Plaintiff did not apply for Direct Services Supervisor recruitment #3259 to which Robert Hamilton was promoted on April 24, 2006, nor did he apply for the Mental Health Therapist recruitment #3357 to which Jamie Long was promoted on September 11, 2006. He did not apply for the Mental Health Therapist position under recruitment #3357, to which Mr. Horn was promoted. Applying for an employment position is generally required to prove discrimination based upon a failure to hire. *Pejic v. Hughes Helicopters, Inc.* 840 F.2d 667, 675 (9th Cir. 1988)(finding that plaintiff had not shown a prima facie case because he did not apply for the position). Plaintiff has not met his burden to establish a prima facie case with regard to these positions. The claims that are based upon Mr. Hamilton's promotion on April 24, 2006, under recruitment #3259; upon Ms. Long's promotion on September 11, 2006, under recruitment #3357; and Mr. Horn's promotion under recruitment #3357, should be dismissed.

Regarding recruitment #3169, at the time plaintiff applied for the Direct Services Supervisor position, he did not qualify for the position because he did not have a Mental Health Professional

designation. By the time he was granted that designation, the county was in the process of offering the positions to three individuals. *See* Dkt. 50, at 53. Even if plaintiff can meet his burden to show that he was qualified for the position at the time the actual promotions were made, defendants have shown that they were in the process of offering the positions to other applicants. However, it appears from the record that there was one position that was not filled from this recruitment. It appears that plaintiff applied for the position and was qualified for the position before the interview process was completed. Defendants have arguably met their burden to show a legitimate nondiscriminatory reason for failing to include plaintiff in the recruitment process for recruitment #3169. Plaintiff has met his prima facie burden with regard to his claim that he was not promoted under recruitment #3169. Plaintiff's claim for failure to promote, based upon recruitment #3169, may proceed.

Regarding recruitment #3287, Pierce County closed the position on May 16, 2006, because no applicant met the needs of the department. Defendants contend that plaintiff cannot state a *prima facie* case of discrimination unless someone other than plaintiff was promoted to the position. However, a plaintiff may state a *prima facie* case of discrimination by showing that the position remained open and the employer continued to seek applications from persons of the plaintiff's qualifications. *See Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.1995). Plaintiff has met his *prima facie* burden with regard to recruitment #3287. Defendants have arguably met their burden to show that no applicant met the needs of the department for this position. However, based upon the facts and circumstances of the case, and the minimal showing by defendant, plaintiff has met his burden to show that the reason given by defendants was a pretext for discrimination. Plaintiff's claim for failure to promote, based upon this recruitment, may proceed.

Regarding Direct Services Supervisor recruitment #3347, plaintiff has shown that he was qualified for the position. Mr. Stewart stated that plaintiff did not answer the questions in his second interview in a way that demonstrated that he understood what was expected nor did he demonstrate that he had the abilities to fulfill the supervisory expectations of a Direct Services Supervisor. Mr. Stewart offered to assist plaintiff in obtaining skills that would assist him in assuming a supervisory role. Because defendants have put forth evidence of a nondiscriminatory reason for not promoting plaintiff to this position, the burden shifts to plaintiff to show that the reason stated by defendants was

a pretext for discrimination. Plaintiff has offered no evidence that the reason for not offering plaintiff the Direct Services Supervisor under recruitment #3347 was a pretext for discrimination. In fact plaintiff admitted in his deposition that Mr. Stewart had not discriminated against him. Plaintiff's claim of failure to promote, based upon recruitment #3347, should be dismissed.

Regarding Direct Services Supervisor recruitment #3417 and the temporary appointment of Adam Horn as Direct Services Supervisor, defendants have put forth evidence of a nondiscriminatory reason for not promoting plaintiff to this position, that plaintiff had ongoing performance issues. Plaintiff has offered no evidence that the reason for not offering plaintiff these positions was a pretext for discrimination. Plaintiff's claim of failure to promote, based upon recruitment #3417 and the temporary promotion of Adam Horn as Direct Services Supervisor should be dismissed.

Pierce County did not fill Direct Services Supervisor recruitment #3495, because none of the candidates interviewed matched the needs at that time (Phoutham K. Bounkeau was apparently hired about four months later under for DSS under recruitment #3495). Regarding the Direct Services Supervisor recruitment #3495, defendants have shown that plaintiff was not promoted to these positions because of ongoing performance issues, which are documented above. Plaintiff has not met his burden to show that the reasons for not appointing him to this position were a pretext for discrimination.

Defendants have arguably shown a legitimate nondiscriminatory reason for failing to include plaintiff in the hiring process of recruitment #3169, and failing to promote him to that position; and for failing to promote him to recruitment #3287. Plaintiff has made a sufficient showing of pretext, since the explanation given by defendants for failing to promote him to these positions was minimal. With regard to the other positions for which plaintiff applied and to which he was not promoted, defendants have made a strong showing of a legitimate nondiscriminatory reason for not promoting him. Plaintiff's performance issues at work were well documented and provided a strong basis for the legitimate nondiscriminatory reason; plaintiff has not made a sufficient showing that the reason given by defendants for not promoting him to these positions was a pretext for discrimination on the basis of ethnicity and religion.

Plaintiff's claims under Title VII, the WLAD, and 42 U.S.C. § 1981, that he was improperly

1  denied promotion on the basis of his ethnicity and religion should proceed as to recruitment # 3169

2  and #3287, and the claims based on all other recruitment numbers and the temporary promotion of

3  Adam Horn to Direct Services Supervisor should be dismissed.

4      *2. Title VII, 42 U.S.C. § 1981, and WLAD Hostile Work Environment*

5          Plaintiff contends that he was subjected to a hostile work environment, due to ethnic and

6  religious comments by employees.  He claims that supervisors knew of the comments and failed to do

7  anything about them.  Also, he contends that Ms. Larsen, his supervisor, commented on his accent

8  many times.

9          Courts have interpreted Title VII to bar not only discrimination as it is traditionally understood,

10  but also hostile work environment harassment.  To prevail on a Title VII hostile workplace claim

11  premised on race, a plaintiff must show (1) that plaintiff was subjected to verbal or physical conduct of

12  a racial nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe

13  or pervasive to alter the conditions of the plaintiff's employment and create an abusive work

14  environment. *Vasquez v. County of Los Angeles*, 349 F.3d, 634, 642 (9th Cir. 2003)

15          Not all workplace disputes fall within the purview of Title VII. The severe and pervasive prong

16  ensures that only truly harassing behavior is deemed unlawful. To determine whether conduct is severe

17  and pervasive, the court looks at the context of the alleged harassment to determine its frequency and

18  severity, whether it is physically threatening or humiliating, and the extent to which it unreasonably

19  interferes with the employee's work performance.  *Vasquez v. County of Los Angeles*, 349 F.3d, 634,

20  642 (9th Cir. 2003). The working atmosphere must be both subjectively and objectively abusive. *Id.*

21  Merely an offensive utterance is insufficient. *Id.*

22          Defendants contend that (1) some of the objectionable comments are barred by the statute of

23  limitations; (2) some of the comments do not relate to conduct that occurred because of plaintiff's

24  membership in a protected class; (3) plaintiff did not bring to the attention of his supervisors the

25  objectionable comments; and (4) the comments were isolated incidents.

26          Plaintiff contends that all of the objectionable comments should be included in plaintiff's hostile

27  work environment claim because they constitute a continuing violation.

28          The plaintiff's complaint, however, alleges discrete acts, which do not establish a claim of

"continuing violation." In 2002, the United States Supreme Court rejected the Ninth Circuit "serial violations doctrine" and claims of "continuing violation" where the conduct involves discrete discriminatory acts. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002). In *Morgan*, the plaintiff alleged racial discrimination and retaliation under Title VII. *Id.* at 101. The court considered "whether and under what circumstances, a Title VII Plaintiff may file suit on events that fall outside [the timely filing period]." *Id.* at 105. The *Morgan* court rejected the Ninth Circuit holding that "so long as one act falls withing the charge filing period, [untimely] discriminatory and retaliatory acts that are plausible or sufficiently related to that act may also be considered..." *Id.* at 114; *see National R.R. Passenger Corp. v. Morgan*, 232 F.3d 1008, 1015 (2000). The Supreme Court determined that an act of discrimination "necessarily takes place on a particular day. ... That is the day that the discriminatory act 'occurred' and thus the day from which the statute of limitations runs." *Id.*

Under Title VII, any event occurring more than 300 days from the date a complaint is filed with the EEOC is time barred. 42 U.S.C. § 2000-5(e)(1). Further, only to the extent that time-barred acts have some relationship to acts within the 300 days may earlier events be considered in establishing a hostile work environment claim. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002).

With regard to the comments made by Ms. Overstreet from 2001 through 2003, it is unclear whether and to what extent Pierce County may be liable for alleged harassing comments, since at least some of the comments were made while plaintiff was working for a private temporary agency. However, a claim based on those comments is time barred because plaintiff did not file his EEO complaint until October 24, 2006, and these comments were allegedly made more than 300 days from the filing of the EEO complaint. Finally, the offensive comments of Ms. Overstreet from 2001 through 2003 that were not reported to plaintiff's supervisors cannot state a claim against the supervisors or Pierce County because they had no knowledge of the offensive comments. Any claim for hostile work environment related to comments by Ms. Overstreet that occurred from 2001 through 2003 should be dismissed.

Plaintiff has identified several incidents that are not shown to have occurred *because of*

plaintiff's membership in a protected class: (1) the December 2003 incident in which plaintiff was sent home because of an overtime shift policy; (2) the Triage Awards Banquet incident; (3) Mr. Holmes' alleged December 2004 statement that "You need to stop it right now"; and (4) Mr. Jorgensen's statement "This shit, Anwar." Any claim for hostile work environment related to these incidents or statements should be dismissed.

Plaintiff has identified an incident involving Mr. DeVoe's allegedly inappropriate comments and behavior in 2005 that he contends was offensive. It is unclear whether that incident would be barred by the statute of limitations. However, Mr. Holmes stated that either he or Catherine Clark spoke directly to Mr. DeVoe about the inappropriateness of his comments, and Mr. DeVoe did not make further inappropriate comments. The record shows that either Mr. Holmes or Ms. Clark responded to plaintiff's complaint about this incident and took action to stop the behavior. Any claim for hostile work environment related to these incidents or statements should be dismissed.

It appears that some of the comments, particularly Ms. Larsen's alleged comments about plaintiff's accent, Mr. Horn's statement about whether he would take advice from an Arab, and Mr. Holmes' alleged response to that comment, at least create an issue of fact as to whether the comments are isolated incidents or whether they were sufficiently severe and pervasive to constitute a hostile work environment.

Plaintiff's hostile work environment claim under Title VII, 42 U.S.C. § 1981, and the WLAD may proceed, with the limitations identified above.

### 3. Retaliation under Title VII, 42 U.S.C. § 1981, and RCW 49.60.210

Plaintiff contends that he was retaliated against for filing an EEO complaint when he was denied promotions for which he was qualified. To establish a retaliation claim under Title VII, "a plaintiff must show (1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." *Brooks v. City of San Mateo,* 229 F.3d 917, 928 (9th Cir. 2000) (*citing Payne v. Norwest Corp.*, 113 F.3d 1079 (9th Cir.1997)). At that point, "the burden of production shifts to the employer to present legitimate reasons for the adverse employment action. Once the employer carries this burden, plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext. Only then does the case proceed beyond the

summary judgment stage." *Id.*

"The causal link between a protected activity and the alleged retaliatory action can be inferred from timing alone when there is a close proximity between the two." *Thomas v. City of Beaverton*, 379 F.3d 802, 812 (9th Cir. 2004); *See e.g. Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir.1987) (holding that sufficient evidence of causation existed where adverse employment action occurred less than three months after the protected activity); *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731-32 (9th Cir.1986) (concluding that there was adequate evidence of a causal link where the retaliatory action occurred less than two months after the protected activity).

The WLAD prohibits retaliation engaging in a protected activity. RCW 49.60.210. Washington courts look to federal law when analyzing WLAD retaliation claims. *See Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 969 (9th Cir.2002); *Graves v. Dep't of Game*, 76 Wash.App. 705, 887 P.2d 424, 428 (1994).

Plaintiff claims that he was retaliated against for filing an EEO complaint by being denied promotions. As identified above, the November 7, 2006, e-mail from Mr. Stewart to Ms. Lewis, creates an issue of fact  as to whether plaintiff's denial of promotion for Direct Services Supervisor recruitment #3417 was in retaliation for plaintiff's EEO complaint; that evidence appears very weak, but is arguably sufficient to withstand a motion for summary judgment. *See Quantz v. Edwards*, 264 Fed.Appx. 625, 628, 2008 WL 176373 (C.A.9 (Wash.)), quoting *Ulrich v. City & County of San Francisco,* 308 F.3d 968, 979 (9th Cir.2002)("As with proof of motive in other contexts, this element of a First Amendment retaliation suit may be met with either direct or circumstantial evidence ... and involves questions of fact that normally should be left for trial.").

Plaintiff's retaliation claim may proceed only as to his denial of a promotion for recruitment #3417.  All other claims of retaliation should be dismissed for lack of a showing of causation.

*4. Claims under 42 U.S.C. § 1983*

Plaintiff contends that his rights to equal protection were violated, based upon his religion, national origin, and age. Defendants contend that plaintiff cannot show intentional discrimination because of his religion, national origin, and age.

In order to state a claim under 42 U.S.C. § 1983, a complaint must allege that (1) the conduct

complained of was committed by a person acting under color of state law, and that (2) the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327 (1986). Section 1983 is the appropriate avenue to remedy an alleged wrong only if both of these elements are present. *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985), *cert. denied*, 478 U.S. 1020 (1986). Plaintiff alleges that defendants violated his constitutional rights to equal protection and due process.

A plaintiff may prove pretext by either direct or circumstantial evidence. *Dominguez - Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1038-39 (9th Cir. 2005). As discussed above, whether defendants intentionally discriminated against plaintiff on the basis of national origin and religion is a question of fact for the jury. Plaintiff's equal protection claim may proceed. Plaintiff has not shown how defendants violated his rights to due process. This claim should be dismissed. As discussed below, plaintiff has shown no evidence that defendants intentionally discriminated against him based on age. Plaintiff's 42 U.S.C.. § 1983 claim for violation of equal protection based upon age should be dismissed.

   *5. Claims for Conspiracy under 42 U.S.C. § 1985*

Plaintiff contends that defendants conspired to deprive him of equal protection on the basis of religion, national origin, and age. To state a claim under 42 U.S.C. § 1985, a plaintiff must demonstrate race or class based animus. *Portman v. County of Santa Clara*, 995 F.2d 898, 909 (9th Cir. 1993); *Bretz v. Kelman*, 773 F.2d 1026, 1029-1030 (9th Cir. 1985). To state a claim under 42 U.S.C. § 1985, a plaintiff is required to allege: (1) That the purpose of the conspiracy was to deprive the plaintiff of equal protection, equal privileges and immunities, or to obstruct the course of justice in the state; (2) that the defendants intended to discriminate against the plaintiff; (3) that the defendants acted under color of state law and authority; (4) that the acts done in furtherance of the conspiracy resulted in an injury to the plaintiff's person or property or prevented him from exercising a right or privilege of a United States citizen. *Sykes v. State of California*, 497 F.2d 197, 200 (1974).

Plaintiff has not shown evidence of the existence of a conspiracy to accomplish an unlawful purpose. The only evidence that might relate to a conspiracy is the November 6, 2006 e-mail

exchanged between Mr. Stewart and Ms. Lewis. The simple fact that Mr. Stewart and Ms. Lewis were in agreement with one another or were communicating with one another about a personnel problem does not convert that e-mail into a conspiracy to violate plaintiff's civil rights or discriminate against him. This claim should be dismissed.

### 6. Discrimination under Title VII, 42 U.S.C. § 1981, and WLAD on the Basis of Age

Plaintiff contends that he was discriminated against on the basis of age, in that Jamie Long, Robert Hamilton, and Adam Horn, who were younger than plaintiff, were promoted and he was not. Plaintiff did not apply for the positions to which Ms. Long and Mr. Hamilton were promoted. Plaintiff did not apply for recruitment #3357, pursuant to which Mr. Horn was promoted to Direct Services Supervisor. Regarding Mr. Horn's promotion to acting Direct Services Supervisor on December 20, 2006, and to Mr. Horn's promotion under recruitment #3495, defendants have shown that failure to promote plaintiff was based on his performance problems, which is a legitimate nondiscriminatory reason. Plaintiff has not shown that defendants' reason was a pretext for discriminating against him on the basis of age.

Plaintiff's age discrimination claims under Title VII, 42 U.S.C. § 1981, and the WLAD should be dismissed.

### 7. Intentional Infliction of Emotional Distress

Plaintiff has alleged a complaint for intentional infliction of emotional distress.

To recover under Washington state law for emotional distress inflicted by intentional or reckless conduct, a plaintiff must plead and prove the elements of the tort of outrage. *Keates v. Vancouver*, 73 Wn.App. 257, 263 (1994), *review denied*, 124 Wn. 2d 1026 (1994). The elements of the tort of outrage are (1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress. *Dicomes v. State*, 113 Wash.2d 612, 630 (1989). The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. *Grimsby v. Samson*, 85 Wn.2d 52, 59 (1975). *Id*. at 59, citing Restatement (Second) of Torts §46 (1965).

Plaintiff has not shown extreme and outrageous conduct, or that defendants intentionally or

recklessly inflicted emotional distress on plaintiff. Plaintiff's claim for intentional infliction of emotional distress should be dismissed.

*9. Negligent Infliction of Emotional Distress*

Plaintiff has stated a claim for negligent infliction of emotional distress.

Washington law recognizes an independent cause of action for negligent infliction of emotional distress for a plaintiff who can establish the elements of duty, breach, proximate cause and damages. *Estate of Lee v. City of Spokane*, 101 Wn.App. 158, 176, 2 P.3d 979, *review denied*, 142 Wn.2d 1014 (2000) (citing *Hunsley v. Giard*, 87 Wn.2d 424, 434, 553 P.2d 1096 (1976)).

The cases cited by plaintiff are not on point. There are arguable issues of fact, including whether supervisors properly followed county policy in reporting allegedly harassing comments of staff members, and properly supervised employees, who allegedly made ethnic and religious comments. The evidence supporting this claim, however, appears very weak.

*10. Time Bar*

Defendants contend that several of the incidents upon which plaintiff's claims are based are time barred under the requirements of Title VII, 42 U.S.C. § 1983, and state law. The court has discussed the time bar issue above related to the Title VII claim. Although they raise the issue of the time bar separately in their brief, defendants have not identified which incidents are time barred and they have not linked these incidents to the applicable law. The court recognizes that some of the incidents may be time barred. Defendants are not precluded from raising the time bar issue by motion or at trial.

*11. Evidence*

The court is not by this order making evidentiary rulings regarding the claims that are dismissed. Rulings regarding admissibility of evidence are governed by the rules of evidence.

Therefore, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. 35) is **GRANTED IN PART AND DENIED IN PART**, as follows:

1. Plaintiff's claims under Title VII, the WLAD, and 42 U.S.C. § 1981, that he was improperly denied promotion on the basis of his ethnicity and religion may proceed as to recruitment # 3169 and #3287, and the claims based on all other recruitment numbers and the temporary promotion of Adam Horn to Direct Services Supervisor are **DISMISSED**.

2. Plaintiff's hostile work environment claim under Title VII, 42 U.S.C. § 1981, and the WLAD may proceed, with the limitations identified above.

3. Plaintiff's retaliation claim under Title VII, 42 U.S.C. § 1981, and the WLAD may proceed only as to his denial of a promotion for recruitment #3417. All other retaliation claims under Title VII, 42 U.S.C. § 1981, and the WLAD are **DISMISSED**.

4. Plaintiff's claims under 42 U.S.C. § 1983 that defendants intentionally discriminated against him on the basis of national origin and religion, in violation his right to equal protection may proceed. Plaintiff's claim under 42 U.S.C. § 1983 for violation of his right to due process is **DISMISSED**. Plaintiff's claim that defendants intentionally discriminated against him on the basis of age is **DISMISSED**.

5. Plaintiff's claim for conspiracy under 42 U.S.C. § 1985 is **DISMISSED.**

6. Plaintiff's age discrimination claims under Title VII, 42 U.S.C. § 1981, and the WLAD are **DISMISSED**.

7. Plaintiff's claim for intentional infliction of emotional distressed is **DISMISSED**.

8. Plaintiff's claim for negligent infliction of emotional distress may proceed.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

DATED this 14th day of August, 2008.

ROBERT J. BRYAN
United States District Judge